The judges of the United States Court of Appeal for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this court. Thank you, Your Honor. May it please the court. These consolidated cases address the decisions of two separate federal agencies, the National Park Service and the Fish and Wildlife Service, separate decisions, separate laws, but they are united by a common thread, which are violations of laws and deviations from the agency's past practice and a rushed decision to authorize the Atlantic Coast Pipeline, which will cut through 600 miles of private lands, two national forests, the Appalachian Trail, and as relevant to these challenges, the Blue Ridge Parkway and habitat for threatened and endangered species. The respondents raised a number of procedural arguments related to statute of limitations, remedy, standing. We've addressed those in our briefs subject to the court's questions. I'll intend to address those on rebuttal. Turning first to the Fish and Wildlife Service's decision, the Atlantic Coast Pipeline will take, that is, kill, injure, and harm five endangered and threatened species. When you say this decision, what are you referring to? The biological opinion, but particularly this challenge, Your Honor, the incidental take statement. Congress has set a flat prohibition. Incidental take statement as it relates to surrogates or what else does it mean? So Congress flatly prohibited take of endangered species and created this narrow exception, Your Honor, for incidental take, the unintended consequences of otherwise legal activities. To make sure that that narrow exception doesn't subsume the bold objectives of the Endangered Species Act to lead to the recovery of species, Congress requires that the incidental take statement set a clear limit on amount of take. So by default, that limit should be expressed as a number of individuals. It can be expressed as a habitat proxy. No one disputes that that is legal if it is clear. If it's not practical to set a more definitive... Proxy, do you mean surrogate? Surrogate, yes, Your Honor. So using impacts to habitat as a surrogate to measure what happens. The challenge here is that's plainly not what the agency did. Now, in Respondent's briefing, they suggest that our dispute is really one about semantics. It's the limit found in the tables, found in the text. The core obligation here of the Fish and Wildlife Service is to analyze the impacts that this project will have to species to ensure that it will not undermine their recovery and their viability. The way in which the Fish and Wildlife Service analyzed those impacts assumed a small impact on a small take of the number of individuals, and that's how they there's a particular portion of the Biological Opinion Incidental Take Statement which describes the impacts to the six species at issue. And for five of those species, they go through and they say, they identify the take, a small percent of individuals. Fish and Wildlife Service concedes on appeal that that is not a practical metric. That's not a measure that works. And this trigger function is critical to how the Endangered Species Act is structured. The point of this trigger, if you exceed the allowed amount of take, whether it's measured through a number of individuals or a proxy, the project must stop immediately. You know you've got to break those species down to be able to speak to us in terms of whether that take statement is sufficient. You've got five of them. I particularly would like you to talk about three of them. Yes. The three that are other than that rusty hatched bumblebee and what's the other one, a cave, some type of cave bat? Madison Cave Isopod, Your Honor. Talk about the other three. Yes. Because that concerns and it cut right to the chase of it because I think that's what we need to address today is whether that Biological Opinion is essentially belied the fact that these are species in which they met the requirements for. Yes, Your Honor. Let's take Indiana bat as an example. It's one of the three because it underscores, it is a great example to explain the ways in which this breaks down. Fish and Wildlife Service did not analyze these impacts as habitat proxy. They articulated a limit as a defective and vague, but number of individuals. When you take their post hoc rationalizations, what they've come up with on appeal, this is in fact a habitat proxy. The whole document breaks down. It's no longer consistent with their analysis and it doesn't make any sense. Indiana bat illustrates that. First, a point, Your Honor. Textually for each of these species, the intestinal text refers to a table where the limit is found. There's two examples that really illustrate that. The one that's not an issue and not one of the three you asked about, Your Honor, but I just want to point you to it. Rona log perch is a species that everyone concedes the Fish and Wildlife Service set a specific numeric limit on it. That limit is found only in the table that on appeal, they're now saying doesn't define the limit. Look to what we actually did. Look to what we intended. When we talk about these species, all six of them, I've never heard of them before. They're interesting in terms of what they are, but at least in terms of what the intent is here, what the desired statute is to protect them, is clear. As you go through this, it's pretty straightforward in terms of what is it about this biological opinion that makes you think they could have established, for instance, a numerical limit, or there's something that could have been done here that takes it out of the realm of saying, no, you cannot do this, and therefore you are able to take the exception. Well, they could establish a numerical limit, Your Honor, and I'll address that, but that's what they tried to do I think is the core point. Well, the cases on it that we have to rely, we don't have to, but at least are helpful to tell you what is considered to be a manner in which you can determine the limit that can be established and whether the geographical basis can be it. So talk to us. Absolutely, Your Honor. It has to serve a trigger function. It has to be clear and enforceable. The case that we cite most often, and is it actually by the preamble of the regulation, Visualizing Circulation, says the agency can't be left with unfettered discretion to decide when the take has exceeded an acceptable limit. The purpose of the limit is to make sure that if there are unintended consequences or if their analysis has an error in it, the species won't suffer. We'll stop and we'll go re-evaluate. On appeal, although the agency approached its analysis to all these projects looking at post hoc rationalization, look at the habitat proxy, to your question, that's where it breaks down because they're crafting this post hoc rationale onto a document that didn't take that approach. Although both respondents agree that these limits are absolutely clear and enforceable, they don't agree what the approach is, they don't agree about where to look in the document to find it, and they don't agree about the specific limits for individual species. To your request to look your question to a specific species, Your Honor, if you look at first that this post hoc rationalization is unenforceable. Indiana bat requires a little bit of understanding. The project will impact four different kinds of Indiana bat habitat. The Fish and Wildlife Service analyzed them and tallied up the acreage totals for each. Fish and Wildlife Service on appeal contends that there is one surrogate, one habitat proxy of a loss of 4,000 acres of those four categories of species. Taking that from this paragraph narrative in the incidental text statement, Atlantic Coast Pipeline, the project builder, sees a different limit. It looks to the table and it says in its brief that the clear and enforceable limit is the individuals present within 1,600 acres of suitable unoccupied habitat, 140 acres of known use summer habitat, and so on for each of the types. Of course, you know, your presentation is excellent because it goes to what's in the record. But for purposes of argument, the simplicity of it helps us a lot. And is this correct? Because I need to ask the other side too. The problem here that I saw with Indiana bat is that there is a previous census that was done by the wildlife that did give the numbers. And there are cases that say if you can do that, then you've got a problem if you come back and say we can't do it. Absolutely, Your Honor. And there's a... My question to you is at least in presenting it, why not present it in that manner? Because that seems to be pretty straightforward if we follow those cases. Absolutely, Your Honor. So it is practical to set a limit in Indiana bat. They've done it before and they... It's not that they can get the numbers, they have them. There is a page in the record for Indiana bat, maybe my finger on the J site for you, where there's a table. I can tell you, for example, that it is the best scientific available evidence and 2017 that there are 425 Indiana bats in the Virginia part of the Appalachian recovery unit. That's a very specific number. It's in the record in a table that is labeled Fish and Wildlife Service opinion is that this is the best available science on populations for Indiana bat. I have no idea how you determine 425 bats anywhere, but the census says it. Well, I mean, this is the point of the defined limit, Your Honor. Of course, they use survey methodologies and statistics and they extrapolate. And there's a lot of assumptions and calculations in there. What Congress and what the regulations requires for them to distill all those assumptions and calculations down to a clear limit. It's the test. It's the confirmation that if we get it wrong, the species doesn't suffer because of our math error. We stop and we reevaluate. So they have done that work with the Indiana bat. They've come up with 425 and we know they can do it for this project area. We asked you to take judicial notice of the biological opinion for the George Washington National Forest plan revision in 2014. That was prepared by the same biologist who signed this biological opinion. In the interest of that Judge Wynn got us on the path of simplicity and he says 425 and it sounds macabre, but really this is a license, if you will, to kill and maim a certain number of species who we know will be killed. That's what it is. It's really not about protection. It's about being able to put a metric on how many you can kill and then if you get to the point where you've killed too many, you're in violation. Am I right? Absolutely, Your Honor. Right. That's the bottom line. It is. And the margin for error is small. There's only 13 colonies of club shell mussel anywhere. Rusty patch bumblebee is on the brink of extinction according to Fish and Wildlife Service's own study. That's why Congress requires so much. That's why those cases that Judge Wynn was pointing to set such a high standard. You can't have unfettered discretion. You have to have a clear limit. We know they can do it because they did it in the George Washington National Forest plan. A clear limit, seven Indiana bats per year, four activities, including linear corridors like a pipeline, including special use permits. The crossing for this pipeline through the George Washington National Forest is a special use permit. So everything you've talked about deals with the ITS statement. Yes. And I think we can kind of look at the Indiana bat, northern long-eared bat, and club shell. But there's an important issue here that deals with this governing statute as to whether it's ambiguous. And ambiguity would determine whether the Park Service acted within its discretion. So speak quickly because you got just a moment to do that. Yes, Your Honor. I think that's before I am reminded to turn to my next argument. The purpose and the text of the statute are both absolutely clear. As I said, this is a narrow exception to what Congress intended was an absolute prohibition on the take of endangered species. It's subject by criminal penalties. If you kill one individual, one of these endangered species, without this permit, you can go to jail. They created this exception and they put clear limits on it. As Chief Judge Gregory indicated, without those clear limits, it now becomes an unlimited license to take these endangered species. So all of Congress's careful work and clear intent to ensure that these species stay on the path to recovery is undermined by this document, which sets a vague small percent of individuals Fish and Wildlife Service concedes is not a practical metric. And on appeal, they're trying to save it by calling it a habitat proxy. But throughout this document, that's not how they analyzed it. And that's the core problem. They're supposed to have done their homework to make sure these species will stay on the path to recovery, notwithstanding these impacts. So but this Mineral Leasing Act, which is what we're talking about, it doesn't address or bar the Park Service from granting this right of way for natural gas. I know, Your Honor. It is a clear expression of intent from the text of the statute that the Park Service cannot. And that's back to your question, Your Honor. That's exactly how the Park Service analyzed its legal authority. It said, well, the Mineral Leasing Act in 1973 didn't explicitly repeal or amend our right of way authority. But the Supreme Court tells us point blank that that's not the standard. So in Brown and Williamson, the tobacco case we cited to you, the Supreme Court said, you know, it does not matter that they, even though it has not been expressly amended, we look to a congressional, a statement of congressional intent to deny authority. Every one of the 10 cases we cited to you in our brief are exactly this fact pattern. They point to, respondents point to, language in the Mineral Leasing Act, they say it's a statute of authorization, not prohibition. The same is true for all 10 of the cases we cited you. Over and over again, the Supreme Court, this Court, have said, when you have an earlier general authority that could apply to a broad category of activities, and a later, more specific authority that carves something out, we view that carve out as a limitation on the earlier general authority. What about Section 468.3? Well, that's the general authority, Your Honor. I mean, what that statute says is you can authorize rights-of-way generally. And the legislative history suggests for the specific purpose of neighboring landowners, but even if you view it in 1940 as authorizing any kind of right-of-way, which is how the Park Service construes the statute, that changed in 1973. So in Brown and Williamson, for example, FDA had authority to regulate drugs generally in its Organic Act. Congress had passed specific statutes regulating tobacco. It didn't say in those statutes, you cannot regulate product labeling. It said we deny you the authority in the statute to regulate product labeling for cigarettes. FDA tried to do it. They went back and they said, well, we can regulate drugs. Tobacco is a drug. And so that gives us the authority to regulate package labeling. The Supreme Court said no. Congress chose to deny you that authority in the more specific statute on tobacco. So bottom line, you got to convince us this is a plain-meaning statute. If it's ambiguous, then the Park Service at least has the discretion, I guess, from a Chevron perspective to do what it did. Absolutely, Your Honor, but the Mineral Leasing Act is not ambiguous. Congress specifically intended to occupy the field. It preempted all other right-of-way authority on federal lands as related to oil and gas pipelines. It set a heightened standard for certain lands. You can only go through, for example, wilderness areas if you demonstrate that it's not inconsistent with the purposes of the wilderness area. That's the same standard that the National Right-of-Way Act and says, well, if we conclude it's not inconsistent with the purposes of the parkway, we can authorize an oil or gas pipeline. Congress set national parks apart. Congress clearly stated, if you want to run an oil or a gas pipeline with its construction impacts, its permanent scar, and its risk of oil spills, I mean, let's be clear what they were worried about at the time, you have to come to Congress and seek individual authorization. And that has happened with every pipeline through national parks. The respondents point you to Great Smoky Mountains National Park where they authorize a specific pipeline on a specific path. Congress reserved the authority to make the balancing of these two important competing policies, energy supply for oil and gas, and our national policy of preserving national parks for future generations. National Park Service denied Congress its reserved authority to do that here. I'll reserve what time I have for rebuttal. Thank you. Thank you, Counsel. Mr. Kupfer. Good morning, and may it please the Court. Avi Kupfer for the Federal Respondents. I'd like to clear up a few points of confusion in how the regulatory scheme for formulating an ITS works. There are three requirements under this, go straight to, because you're going to have very limited time. You can listen to the scheme, your briefs are very clear on it. There are five species here that seem to be in question. Personally, two of them don't bother me very much, but three of them deal with the Indiana bat, the northern long-eared bat, and the club shell. There seem to be at least case law that indicate that in instances where you've conducted a previous survey where you've done something to indicate that, no, this is not impractical, to then come back and say it is, you've got a problem. Well, that's not true, Your Honor, with respect in each of those previous instances. Not true with respect to what I just said in terms of the law, not true with regard to these three. So it is incorrect that the Fish and Wildlife Service has not used surrogates for those species in the past. In each of the cases where the petitioners present previous ITSs used by the Fish and Wildlife Service to set limits on take of those two, of the Indiana bat and the club shell species, they did use surrogates to monitor take of those species. And each of the citations for each of those ITSs are at pages 22 and 23 of the Federal Respondent's Brief. So if there are surveys or censuses back in 2015, this 425 bats I guess is one of the examples you give, but you have the same thing for this northern long year. I think the club shell is a little closer. But there are surveys for that. You're telling me that even though they had those surveys and the competitive numbers, they still used surrogates? That's right. Because the point of the impracticality determination isn't just a front-end determination. It's not just about ability to put a number on how many bats they think are going to be taken. If you look at the regulatory language, it also requires the Fish and Wildlife Service to determine if they can actually count those bats individually. If counting them individually is a practical way to monitor whether take has exceeded that that has been authorized in the ITS, which would be a violation of Section 904. How do you define small percent? What does that mean? Well, I think, Judge Thackeray, that gets to the point that the Fish and Wildlife Service is making. They can't determine a precise number of bats in that area. How is there a clear limit? The clear limit is the surrogate, which is the impacted habitat. In the case of the Indiana bat, it's... The clear limit, I mean, so small percent of some surrogate is the clear limit whatever Fish and Wildlife decides it is? No, Your Honor. On pages 51 through 53 of the buyout, that's 444 through 442 of the joint appendix, for each of those species, the Fish and Wildlife Service says, listen, we know that this species is in this area, but it's simply impossible to detect this on the ground in real time. I mean, we're talking about one and a half inch bats that live in caves and exfoliating part of the trees. You don't define small percentage to follow up on Judge Thackeray's question. The case law says, yeah, small percentage is good, but you can't give unfettered expression what it is. Who's going to tell us what small percentage is? In other words, you need to give something in there as a baseline as to what it is. Well, Your Honor, I'll take with... To be fair, the Fish and Wildlife Service does not need to a vague phrase used like a percent of individuals. They need to provide a more precise measure. That's exactly what they did here in the form of these narrowly defined geographic areas of impacted habitat. What's the baseline estimate that you say is there? What is that baseline estimate that they are providing? The baseline estimate for the club shell is 585 meters of stream where they anticipate club shell to be present. They've done survey after survey in the area, and because of species, biology, and behavior, it's just not feasible to expect the action agency FERC to be able to find those club shell in the field. So they could set a numerical limit, but it wouldn't actually provide a meaningful limitation on take because there's no... Are you saying the geographical region becomes the defined baseline? That's right, Your Honor. It is the... We don't know what's in it or what's being taken out of it? Well, there's sufficient science to allow the Fish and Wildlife Service to make a pretty good guess that the species is there. A pretty good guess? Doesn't it have to be clear and enforceable? Pretty good guess is nowhere in the law. Judge, there is a clear and enforceable limit. Okay, what is it? The clear and enforceable limit is the precise measure of these habitat areas. If the action agency or the pipeline company were to do any activity outside of those areas or were to do activity... So they can kill all of them in those areas? Yes, Your Honor. That's how an ITS works. If you don't know... It's not just a matter of kill. I mean, take is a term of art under the Endangered Species Act. So some of the forms of take we're talking about here are simply impossible to monitor in terms of rate of pregnancy for bats or increased rate of malnutrition. They could say, okay, 50 bats are going to suffer an increased rate of predation. But that doesn't set a meaningful limit. As Petitioner said, the point of an ITS is to set a limit that, if exceeded, would be a violation of Section 9. And Fish and Wildlife knows these species' biology. They know their habitat. They know the fact that these species are just impossible to detect in the wild. What about Judge Wynn's earlier point that Fish and Wildlife was... There was a survey before of how many bats there were in a particular area. So in each of those cases where previous survey work was able to identify a precise number of bats, Fish and Wildlife also used a surrogate. They could do surveys from here to the end of time, but that wouldn't change the fact that they're going to have to use a surrogate to detect, to monitor take of these species in real time. We're talking about a one and a half inch bat, and the form of take that we're talking about is an increased rate of predation. That is not... If, for example, Fish and Wildlife were to say, okay, we think 50 bats are going to suffer an increased rate of predation, that wouldn't supply a meaningful trigger to monitor take of that bat because the action agency and the pipeline company wouldn't actually be able to detect that in real time. The point is what Fish and Wildlife has to do is to set a meaningful trigger. If they can't do that directly because of species biology and concealed habitat, which is the case of these three species... They have to set a clear limit. And they do. They do that with five distinctly defined areas of habitat. If any activity happens outside of those areas, the limits in the ITS will have been exceeded. If activity happens within those areas that hasn't been analyzed within the ITS, like a different form of drilling method that's being used, the ITS will have been exceeded and the action agency will have to reinitiate consultation. This is just like the Pacific Shores case in the D.C. District Court where tidewater goby were being analyzed. And the D.C. District Court said it's perfectly common to use a vague phrase and a more precise standard because we're talking about these species that are just really impossible to detect in real time. And petitioners haven't supplied any sort of way that these could have been detected. And the administrative record doesn't support such a finding. Practicality doesn't turn on if surveys can estimate the number of individuals taken. As I mentioned before, even if they were able to estimate a precise number of bats or a precise number of club shells, this would fall into the category of cases that are just like those previous ITSs that respond in site where the Fish and Wildlife Service still used a surrogate to monitor take of those species because trying to count individuals doesn't actually set a meaningful limitation on take. That's the goal of an ITS and that's what the habitat surrogates do. Page 440 through 442 of the record, they do that. 585 meters of creek, 7.3 hectares of beehive potential zone, 11.2 surface acres of isopod habitat. And the limit is is there activity happening outside of that area in that species habitat or are there additional activities that haven't been analyzed in the ITS that are happening within that area? But in that area, there is no limit. In that area, there is no limit. That's correct, Your Honor. But I thought your no jeopardy determination jeopardized in terms of the endangered species rested upon the small percentage of them. Well, petitioners don't challenge the no jeopardy determination. Say that again. Petitioners do not challenge the no jeopardy determination. That's my question. Yeah. My question is I thought your no jeopardy determination rested upon this determination that a small percentage would be taken from the designated areas. And now it sounds like 100% will be taken from the designated areas. I see the question. No, it doesn't rest on that. The no jeopardy determination is a wider angle look at the entire species. So if you take the club shell, for example, there are 1.1 million club shells that have been identified through surveying in the United States. They found 19, 19 of 1.1 million in this creek area. They think there may be more, but surveys can't identify more because the species lives buried underneath the bottom of the stream. So is your bottom line that no jeopardy will occur regardless of how many individuals are taken from the area? Within the habitat area. That's correct. So no jeopardy is the take. You take every one of them, no jeopardy. Within the area. That's the limit. The limit is take within the area. I mean, in Fish and Wildlife's expertise as biologists and surveyors, they have determined that any level of take within this area will not jeopardize the species. And the petitioners do not challenge that determination. Certainly they think that it will be a smaller percentage in the case of some of these species, but the bottom line for purposes of, for creating a meaningful limitation on take, is that they can't count these species. There are not protocols that will allow the pipeline company or the action agency ever to be able to count, you know, Indiana bass. I'm still on, what does the small percent apply to? The small percent. Outside the area? No, the small percent is within the area. I mean, so there are three things. It's 100% within the area. I don't. So the limit is the area. Any take within that area is permitted. This is, I mean, if you look at the five. Just back is asking a very plain question to you. She said that what does small percentage mean in terms of the habitat surrogate, if you can take 100% in that small percentage of what, where? So small percentage of what, where? That's the question. Fish and Wildlife believes that, for example, only a small percentage of Indiana bats within that area will suffer an increased risk of predation. But that's just again, and that's 100%. You said 100% before in the area is the take limit. So let me be clear. The limit is take within that area. They think that a smaller percentage of take will happen, but the limit is only surpassed if activity occurs outside of that area or if activity within that area is activity that hasn't been analyzed in the ITS. Under the Endangered Species Act, what the agency has to do is specify the impact of incidental take. But one of the other things they have to do is exactly set a clear limit for monitoring numerical take. Specifying a number of individuals for these species cannot set a clear limit for monitoring because there's no way to actually find these species on the ground. And for some of these forms of take, like increased risk of predation, there's simply no way to monitor it. There will definitely be no way to find them if there's 100% take. Well, that's precisely why surrogates use it, because there's no way to find it. It's indirectly measuring another variable. A surrogate's a variable that indirectly measures the first variable. The first variable is take. Loss of habitat is indirectly measuring take. That's what the Ninth Circuit approved in Center for Biological Diversity in 2012. That's what the D.C. District Court approved in Pacific Choice case. That's fairly standard operating procedure for these species that are just Well, I understand the intervener is going to come forth, and that's going to be the first question I'm asked. If there are no further questions, thank you. Thank you. Smith? Thank you, Your Honors. May it please the Court. My name is Brooke Smith. I'm here on behalf of Indulgence that I might start with the Blue Ridge Parkway permit, because there hasn't been much time to address this. That's right. That's a big issue, but I do want you to answer the initial question. Do you agree with the government's understanding as to the take limits? Yes, Your Honor. There is no daylight between our positions. We read the small percent language to be vague and indecisive for purposes of monitoring take-related impacts. Habitat is the surrogate that can be measured along this pipeline route, and if take occurs outside of those clearly defined areas along the 600-mile route, that's not permitted. It's a violation of Section 9. Of course, there are cases that interpret that a little differently and see that in terms of how you're using a geographical area and taking all of them there. There are cases that have gone If I may step back for a moment, we did exhaustive surveys that led to the biological assessment that FERC adopted in the EIS and the Fish and Wildlife Service used as the basis for their biological opinion. Thousands of surveys for the bats, for the Madison Cave isopod, for the bee. Club shell is an example. 168 club shell were identified in 1995 by the state as part of a census of club shell population. Only 19 in 2004 and zero the last time we surveyed in 2016. You can find a number for these species for sure. The problem is the number is variable, and if we know that the species may be present along the pipeline route. You know, you didn't help yourself with that first statement. You can find the number. Your task is to make sure that it's impractical to do so. The number is reflected in the biological opinion, your honor. The rule says that you have to say that it's impractical both for defining it on the front end and for monitoring it on the back end, and that is the most critical component to us in this ITS because based on the difficulty detecting these species because of where they live, because of their size, because of their life patterns, it is impractical to monitor whether one club shell or 15 club shell within that clearly defined 585-meter area around the particular bridge crossing would be taken. So the service defaulted to a habitat surrogate that can be measured. To us, that is the most critical aspect of causation under the incidental take rule. If you can't count how many in the How are you going to enforce a take beyond the habitat? When do we know that has occurred? So the FERC order, the biological opinion, the conditions of construction require constant inspection of this pipeline route by the applicant, by the federal government, by state agencies, by the Fish and Wildlife Service. If any take is identified outside of these defined areas, it is disallowed under the incidental take statement. How are you going to find anything underground? How do you know you took them? How would you know? Well, the locations that were defined are based on surveys. We know what the location defined. I'm talking about you said you can see that you can't have take beyond the surrogate habitat, correct? Correct. Well, how would you know what's on the ground? Well, the surveys helped us determine that they're unlikely to be present outside of these areas. So we're presuming that even if you go outside of the area of the habitat that you still are taking? If it is detected, it is unlawful. But you just said you presume there's not a take. Any take outside of the defined habitat is unlawful. I heard you say that twice, but how do you define when you have taken? How do you know? Precisely... Can't something be so dangerous to an endangered species that the answer might be to protect the American citizens that you can't do the activity? Is that ever a case where the species to be protected by the government are more important than the activity? Absolutely, Your Honor. But then maybe this is a case when you can't even count when you have violated the surrogate habitat. We don't even know when you have or would have, correct? But the conditions of construction require us to monitor to determine if there's a take. But you won't know. You may know. You should know. Are you going to do sample borings to see if you kill crustaceans that are subterranean? Indeed, the FERC order requires that. It is a condition of the FERC order. How often do you do those outside of the surrogate habitat? You have to do it as part of construction. How often? How often? Before you start the construction. Before, but not during? The particular geotechnical borings into karst terrain are required for ESA purposes before construction begins. But not during? There are separate state and federal permits that require continued geotechnical work throughout the construction project. There are 33 federal and state permits at play here. All have protective measures to ensure that the resources to be protected are protected to the extent possible. Indeed, the routing of this pipeline involved hundreds of re-routes and hundreds of miles of re-routes to avoid habitat in the first instance, minimize it in the second, and then every one of these five species has conservation measures and protective measures designed to minimize the potential for take. If I may turn briefly with one minute left. Let me take you there quickly because you have less than a minute. Yes, Your Honor. Let's assume that the Mineral Leasing Act does not address this and then turn to the Blue Ridge Parkway Organic Act. Tell me why you think it's ambiguous. Well, the Blue Ridge Parkway Organic Act, A3 and A8, which you've cited, do not limit the types of right-of-ways that may be granted by the National Park Service. I think the Mineral Leasing Act of 1973 is a bit of a red herring because it accepts national park lands from the definition of federal lands. In point of fact, the Mineral Leasing Act since 1920 has always accepted National Park Service lands. It's not a novelty of 1973. There are situations where what Park Service cannot do under the Mineral Leasing Act, they do through their own statutory authorities. Oil and gas exploration is a great example. It's covered by the Mineral Leasing Act. Park Service can't apply those procedures, and yet the Park Service has an entire set regulations to deal with oil and gas exploration on National Park Service lands that have been upheld by the court on appeal. The exception is not a prohibition. The Mineral Leasing Act simply provides a process for dealing with these types of pipelines on federal lands. So I was trying to shortcut you because your time. I asked you to just assume that it doesn't address it and go straight to the Blue Ridge Parkway Organic Act and tell me, does it authorize the grant of this right-of-way? It absolutely does, Your Honor. How so? On its face. It says, The Secretary of the Interior may issue revocable licenses or permits for right-of-ways over and across Nippon Parkway lands for such purposes and under such terms and conditions as the National Park Service may determine. And that's exactly what they did here. Indeed, there are 14 other existing pipelines crossing the Blue Ridge Parkway. The most recent three were approved between 2000 and 2002,  Thank you. Thank you, Your Honor. I'd like to respond to a few of the points first on the Fish and Wildlife Service. Speak on that last point there because otherwise you're not going to have a chance to do it. Yeah. So that's exactly how they must read the Blue Ridge Parkway. The National Park Service reads its right-of-way authority to authorize. They say this in their brief. Any right-of-way across a unit of the National Park System, any right-of-way at all, they can do as long as they find it's not consistent. But the text of the statute tells us, and the legislative history supports this, what Congress was worried about in 1940 when it went back to give the Park Service limited right-of-way authority was to address the needs of neighboring adjacent landowners. The report, the congressional report that the Park Service cite says the concern is ingress and egress for adjacent landowners. As counsel for Atlantic points out, Congress has consistently turned down every opportunity to grant authority for oil and gas pipelines through national parks, except when it has come in and said specifically in a specific park on a specific route, you can have the oil and gas pipeline here. So there's one question, and I'll make sure I get it right to you. Yes, sir. I think it's critical. You've got this organic act here. Question is, why isn't it at least ambiguous as to whether by the owners or lessees to adjacent land modifies both permits for the right-of-way across the land and for the use of the parkway lane? Why is it not ambiguous? So the intent is not ambiguous, Your Honor. So I think even if you find the grammar of the text ambiguous, the exercise, under our Chevron analysis, it's still clear if together... That's all we need to find is the grammar of it. I don't know what you mean, grammar ambiguous, when we're trying to determine, is there ambiguity in a statute? And if so, then we slide into Chevron. My understanding, Your Honor, is the exercise to determine if there is ambiguity in congressional intent using multiple lines of evidence. The text, clearly, the first and best. If you find the text consistent with two, if the intent is clear from the other lines of evidence, for example, legislative history, what Congress set out to do in 1940, then that's still a clear, definitive description of what they were trying to do. What they were trying to do was address neighboring landowners, not industrial uses of national parks, which, as Council for Atlantic concedes, would be a deviation from a century of practice to think that at that time in 1940, Congress thought to open up an exception for... Remember that Congress dealt in one breath with oil and gas pipelines. So we're talking about a gas pipeline today, but this is also... The consequences of an oil spill on a national park was in Congress's mind every time it has turned down the opportunity to authorize oil and gas pipelines. That's why... Not to take your questions about the Bush Park, but that's why even if you find it ambiguous, even if you get... The congressional intent is not clear. We think it is. Congress addressed that in 1973, and the Supreme Court tells us to look to that later expression of intent as a limit on that earlier ambiguous authority. You have to apply Congress's intent in 1973 because we don't expect Congress to go back through and parse the United States Code and find every general statement of authority, which might be construed as an exception to their choice to deny authority to oil and gas pipelines across units of the national park system. So that's true if we look to legislative history, but not all courts do that. The Fourth Circuit has a very nuanced way of looking at legislative history in light of Chevron deference. I understand, Your Honor, that legislative history around the Blue Ridge Parkway Organic Act in 1940 doesn't require any sort of adventurous search into legislative intent. It's right there on the basis... I mean, in fact, the Congress floor statements, all the Senate reports, House reports we all cite, all put from the same Department of Interior letter to Congress saying, look, we've been granting rights of way to neighbors to conduct residential and farming activities to get access to their land, and we've allowed some of them to have access to public utilities. Well, of course. Of course they wanted to do that. That's the problem they sought to address. And what the Park Service is asking the court to accept is that in that 1940 decision to accommodate neighbors, they did something for the Parkway that they've done nowhere else. Notwithstanding the fact that the Parkway acknowledges, for example, the Appalachian Trail, also a linear park unit, the bore under the Blue Ridge Parkway is going to go under the Appalachian Trail. They're in the same part of the world. Both linear units of the National Park System, and the National Park Service told Atlantic, told FERC, we have, citing the Mineral Leasing Act, we have no authority to authorize you to cross the Appalachian Trail. It's a unit of the National Park System. And Congress told us we can't do that. I take it if you can't get this across the Appalachian Trail, this whole pipeline goes down the tube, right? Well, they are crossing the Appalachian Trail, Your Honor. Their theory is that because they're crossing it on land managed by the Forest Service, they have authority to do that. That's at issue in another appeal pending before the court in September, I think. We expect it to be heard. But the Blue Ridge Parkway Organic Act offers no reason to interpret it differently than how the Park Service approached the similar language in the Organic Act for the Appalachian Trail. And again, if you find ambiguity in the 1940 law, well, remember, they can do it only if it's consistent with park purposes. If there's any doubt about what's consistent with park purposes, Congress told us what is in 1973 when they said, we find national park units completely inconsistent with the idea of oil and gas pipeline crossings. To the Fish and Wildlife Service, biological opinion, I'm sorry, I see him over, unless you have any further questions. Thank you very much. Thank you very much. Thank you. We'll come down with the counsel and proceed to the next case.
judges: Roger L. Gregory, James A Wynn,jr., Stephanie D. Thacker